# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CR-24-57-RAW** |
| | ) | |
| **KENDALL LEE FORRESTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Defendant Kendall Lee Forrester is charged in a three-count Indictment with murder in Indian Country, in violation of 18 U.S.C. §§ 1111(a), 1151, & 1153; use, carry, brandish and discharge of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(a)(i), (ii), & (iii); and causing the death of a person in the course of a violation of Title 18 U.S.C. § 924(c), in violation of 18 U.S.C. § 924(j). Each count contains a forfeiture allegation. Defendant now seeks suppression of statements that he made after his arrest. The Court referred Defendant's Opposed Motion to Suppress Statements and Brief in Support Therein [Docket No. 29] for a report and recommendation pursuant to 28 U.S.C. § 636(b)(2)(B) [Docket No. 31]. The undersigned Magistrate Judge held a suppression hearing on Monday, July 8, 2024. For the reasons set forth below, the undersigned Magistrate Judge hereby recommends that the motion to suppress be GRANTED.

## Background

The Indictment charges Defendant with committing murder in Indian Country on or around October 31, 2023.  The following day, the victim's body was discovered inside a wood chest located in the trunk of a vehicle in Heavener, Oklahoma.  On November 2, 2023, Defendant was arrested for the murder and taken to LeFlore County Jail, where FBI Special Agent Brett Collins and Choctaw Nation Lighthorse Police Investigator FNU Walden interviewed Defendant that same day.  In the motion and response brief, the parties provided audio only (not video), as well as a generated Transcript for the Court's review.  In its Response, the Government urges the Court to look at the context of the entire conversation and asserts that sometimes Defendant would not audibly answer questions but instead answered using body language.  *See* Docket No. 34, p. 3.  The undersigned Magistrate Judge set the motion for suppression hearing on Monday, July 8, 2024.  Shortly before the hearing, the Government filed an "Amended Response" to Defendant's motion, attaching a video of the interview for the first time.[1]

The video captures the interview/interrogation room where Agent Collins and Investigator Walden questioned Defendant and shows Defendant entering the room wearing an orange jumpsuit, handcuffs, and leg shackles.  The handcuffs and shackles remained on Defendant throughout the interview.  The first part of the interview includes introductions, asking about Defendant's state of mind/medication usage, and obtaining his

---

[1] It is unclear whether one or both parties had the video at the time the motion and response were filed, but the undersigned Magistrate Judge confirmed that Defendant's counsel had reviewed it before the hearing.  The Government offered no explanation in the Amended Response for the delay or why the amendment was necessary at that time.

signature on a *Miranda*[2] waiver.  Defendant signs the waiver, and the interview begins.

While Defendant signed the waiver form, the Transcript reflects Investigator Walden said:

> 05:01[3] **INVESTIGATOR WALDEN** The one part, you understand that if we start talking and you decide to stop, *all you gotta do is tell us. And we're done.* And we won't ask you anything else. *You don't have to say anything else.*

Docket No. 29, Ex. 1, p. 3.  Relevant excerpts after Defendant signed the waiver are provided below:

> 06:25 **INVESTIGATOR WALDEN** Okay, so what happened the day before that, which would have been Tu . . . Tuesday
> 06:29 **AGENT COLLINS** Tuesday. Halloween day
> 06:49 **KENDALL FORRESTER** 17 years I've had people after me try to get in the hope of every one of y'all, to help me, end up talking and ain't one of y'all done s*** for me.
> 06:58 **AGENT COLLINS** What do you mean by that? People after you.
> 07:02 **KENDALL FORRESTER** *That's it. I'm done.* [Defendant, handcuffed, slashes his right hand down and to the right in a "no" gesture] F*** this.
> [15 seconds, during which Defendant rolls forward, rolls back to the corner of the room, swivels slightly to lean back while putting his feet on the desk, pauses, and adjusts his handcuffs, while the officers remain still][4]
> **[KENDALL FORRESTER]** Look at that new tattoo on her leg. That one's[] my nephew. F*** her.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] Defendant provided a Transcript of the recorded interview, generated by JusticeText, to aid the Court in reviewing the claims.  *See* Docket No. 29, Ex. 1.  The Government did not object to the use of the Transcript either generally or specifically in its Response, even citing to it in the Response. At the hearing, Defendant's counsel clarified that the Transcript was meant to be a helpful aid but asked the Court to rely on the audio and video for any necessary clarification.  The undersigned Magistrate Judge has adopted excerpts from this Transcript, with only minor changes for punctuation or clarification based upon review of the audio and video.  The timestamps in the Transcript, used throughout this Report and Recommendation, reflect the audio provided to the Court, but do not match the video, *see* Docket No. 36, Ex. 1. All emphasis added.

[4] The audio and video reflect many instances where the Defendant sat silently while the officers waited for him to speak, and these pauses are not reflected in the generated Transcript.  Docket No. 29, Ex. 1.  Some pauses are reflected in this Report and Recommendation, but only as relevant to resolution of the motion to suppress.

07:30 **AGENT COLLINS** *I just want to be clear.* It seems like you have a lot of emotions going on right now. And I feel like you, to some extent, want to talk to us. But are you telling us at this point, that you don't want to talk to us without the lawyer present, because there's obviously more to this. I mean, I don't know what you're talking about with the tattoo, but, I mean, I just got to be clear before we go into further details on this, where you're at, I just got to know if you're saying you don't want to talk to us, without a lawyer present? I know you said, f*** this, but.

08:11 **KENDALL FORRESTER** Y'all ain't done nothing for me in the past.

14:03 **AGENT COLLINS** Yeah, and I know, you know that. I'm just. I don't know what. Exactly what that means. So, help me understand what she's proud of.

14:13 **KENDALL FORRESTER** Send me to f***ing prison.

14:14 **AGENT COLLINS** Huh?

14:15 **KENDALL FORRESTER** Send me to f***ing prison.

14:17 **AGENT COLLINS** Dude, we're not. We're not even talking about that right now. We're trying to understand. Obviously, this is emotional thing for you, okay? And we want to understand the full picture. So obviously there's some meaning behind this tattoo. You know what I mean?

14:38 **KENDALL FORRESTER** You got it

14:40 **AGENT COLLINS** What, uh. What exactly? Explain it to us. What was she proud of?

14:52 **KENDALL FORRESTER** I told you

14:52 **AGENT COLLINS** I'm jumping to conclusions here just because you're not telling me more on this, but was there possibly foul play behind the nephew's passing?

15:01 **KENDALL FORRESTER** There was.

15:02 **AGENT COLLINS** Okay.

15:02 **KENDALL FORRESTER** There was. Absolutely. 100%

15:04 **AGENT COLLINS** okay. Can you tell us more about it?

[Nine seconds of silence]

15:38 **KENDALL FORRESTER** [No,] I can't tell ya.

[Twenty seconds of silence]

15:38 **AGENT COLLINS** We're not going to know if you don't tell us, man. I know law enforcement responded for that event. but maybe not all the full details got out. And you kept that inside, and that's been inside you for a year now, or however long it's been. Stuff like that can.

16:00 **KENDALL FORRESTER** Y'all said y'all had some things to explain.

16:04 **AGENT COLLINS** Law enforcement did.

-4-

16:05 **KENDALL FORRESTER** Y'all said y'all had some things to explain. Here.

16:12 **AGENT COLLINS** We had some things to explain.

16:14 **KENDALL FORRESTER** Yep.

16:16 **AGENT COLLINS** Who said that?

16:19 **KENDALL FORRESTER** Y[']all did whenever y'all came in here.

16:19 **AGENT COLLINS** Yeah. Yeah.

16:20 **KENDALL FORRESTER** y'all had somethings to talk about.

16:22 **AGENT COLLINS** Yeah. But we. We are. We would rather just listen to you

16:28 **KENDALL FORRESTER** I bet you would

16:28 **AGENT COLLINS** because stuff you're mentioning right now about possible foul play.

16:34 **KENDALL FORRESTER** Thats a lot of s*** you don't know.

16:34 **AGENT COLLINS** Exactly. That's why, huh?

[Defendant stands]

16:39 **KENDALL FORRESTER** but anyway, ***I'm done***

[Defendant sits down with hands clasped and head bowed]

16:39 **AGENT COLLINS** *You're not*.[5] You don't want to tell us your side of things. [Defendant shakes head from left to right in apparent "no" gesture, eight seconds of silence] We're just trying to hear your side, man. Okay? As you see, we're not trying to bulls*** you. We don't know this stuff regarding the foul play, regarding your nephew's death, okay? Stuff like that. People hold inside for long periods of time that can escalate things, an outburst. Because when people hold that stuff in, man, it's super emotional and traumatic. And if people aren't getting the help they need, as far as therapy and counseling, that stuff can boil over. And just the littlest things can make people react in ways that they typically wouldn't.

17:19 **INVESTIGATOR WALDEN** If you take that stuff and add it to the stuff that you were saying about her being involved in one of the people that's been after you, and she gets. You said high on meth, right?

17:30 **KENDALL FORRESTER** Yep

17:31 **INVESTIGATOR WALDEN** she gets high on meth and starts telling you all this stuff. I mean, those two things together.

17:39 **KENDALL FORRESTER** Well, she called [him] her husband

---

[5] At the suppression hearing, the Government for the first time objected to this portion of the Transcript (despite citing to it in the original Response), asserting that the Transcript contained a number of errors. In response to the Court's request for identification of the relevant errors, the Government only pointed to this instance, asserting that Agent Collins said "I'm not." A review of the audio and video reveals that the discrepancy is one of punctuation. Agent Collins appears to be formulating his response out loud, "You're not-- you don't want to tell us your side of things. . . ."

17:43 **AGENT COLLINS** Well, and she's went to the point to get a tattoo. I don't know all the details of that tattoo.

17:50 **KENDALL FORRESTER** Anyway, ***I'm done. I said I'm done.***

17:53 **AGENT COLLINS** *Okay. We respect that.* But you got[ta] understand.

17:58 **KENDALL FORRESTER** *No, I said I'm done.*

17:58 **AGENT COLLINS** *I can talk, though.* We're at a point where we don't even get an opportunity to hear this explanation. So, we would just like to hear from your sideboard. But when you say you're done, we can't talk to them. Okay? So, we're here coming with you at respect, trying to be understanding, and you telling us that you're done, and you want to vote your rights, if that's what you're saying, that's your right. Dude. We don't hold that against you at all. Okay? But you got to understand that we are truly coming at you to hear your story and not trying to trick you, not trying to play games. There's. There's an explanation to all this. There's never just a random. You're not the type of guy that's just going to do some random thing and you're not, you know, we don't know the details, so. But at this point, dude, we just. *We can't speak with you because you've told us multiple times. That's where your stance on. Okay, get that.*

19:10 **INVESTIGATOR WALDEN** Now, understand, if something changes and you do want to get. I mean, if it was, if whatever happened, was self-defense.

19:19 **KENDALL FORRESTER** How do I even know if I can trust you on that?

19:22 **INVESTIGATOR WALDEN** sir?

19:23 **KENDALL FORRESTER** How do I even know if I can trust you?

19:26 **INVESTIGATOR WALDEN** I mean, we're here to give you an opportunity to let us know what happened. Like I said, we wasn't there and.

19:32 **AGENT COLLINS** You've never met us, dude. You're not going to know that. But that's why we're here talking to you, because we're trying to build our trust with you. You don't know us; we don't know you. That's how trust begins, is conversations. I think you can tell, right? We're not trying to bulls*** with you, man. Okay. We're truly. We're here talking about now. We're talking about this nephew story has nothing to do as far as what we knew prior to coming in here with anything. But we're going down this because it's obviously affected you. It's. You're obviously emotional about it. It's a traumatic experience. Anyone that has experienced that, it'd be traumatic for. And that sounds like a very reasonable explanation as to why all this could have potentially happened. But we don't get to get that full picture from you when you tell us that you're done. So, we just got to be clear. When you say you're done, that you're done, that you're saying you

don't want to talk with us without a lawyer. Okay. Because being done could mean I'm done.

20:40 **KENDALL FORRESTER** Saying emotionally, I can't sit here and f***ing tell you the s***

[From 20:44 to 28:03, Agent Collins and Investigator Walden take turns speaking while Defendant remains silent]

28:03 **AGENT COLLINS** Tell us about Angie and the nephew.

28:04 **KENDALL FORRESTER** I already did.

28:04 **AGENT COLLINS** Did Angie, do it?

28:14 **KENDALL FORRESTER** Yeah.

28:22 **AGENT COLLINS** Did you try to tell law enforcement?

28:26 **KENDALL FORRESTER** F*** the whole f***ing world.


39:54 **AGENT COLLINS** What were you experiencing at the time to think someone was coming after you? Like, I know you said you didn't know who it was, but, like, what was going on that made you think that there was someone coming after you?

[39 second of silence]

40:41 **KENDALL FORRESTER** *Y'all done[?]*

40:41 **AGENT COLLINS** *I'm not, dude.* And like I told you, I can sit here all day, okay? Cause I know sometimes this stuff takes a while to process


43:15 **AGENT COLLINS** What are you looking at? [Defendant looking at handcuffs]

43:18 **KENDALL FORRESTER** The name on it

43:19 **AGENT COLLINS** The name

[66 seconds of silence]

44:25 **KENDALL FORRESTER** *Yep. All right then, y'all done?*

44:31 **INVESTIGATOR WALDEN** *We're just trying to give you ample opportunity to tell us anything that you want to tell us. Do we want to be done? No.* If there's information that you have that can even help you out, we'd love to hear it. That's why we're here.


53:50 **KENDALL FORRESTER** *But anyway, there it is. I'm done. I really am. Now.*

[Defendant blows his nose in a paper towel, stands]

53:58 **AGENT COLLINS** *Have a seat, man.* [Defendant sits on side of desk, and remains there until 55:38] *We'll respect that, okay? We'll get you out of here.*

54:04 **INVESTIGATOR WALDEN** Want a fresh one?

54:07 **AGENT COLLINS** We'll get you out of here if you want us to come back. I know you said multiple times you were done because you're not

emotionally ready, okay? If at some point you feel like you're emotionally ready and you want to go back further into this, we'll dive into it, okay? But you're telling us you're done again. So, you're obviously at a point right now where you're just not emotionally ready to talk about it. And we'll respect that. Okay? But I will tell you before we leave here. All we have right now is what you just told us, which is very good information, but there's a lot more there that we're missing out on. So, all we have right now is Angie, dead, you know, in a wooden box. And there's a reason for that, Okay? You're definitely not a type of guy that just does it because he wants to do it. There's a reason why all this happened, okay? And I believe that 100%. And until we hear that from you, all we have is Angie in a box, okay? And now we have this information about her bragging about killing your nephew, which is huge, okay? That's huge information that we didn't have until we came and talked to you.

55:16 **INVESTIGATOR WALDEN** and also, part of the group that's after you.

55:16 **AGENT COLLINS** So, I'm glad we came and talked to you, even though we didn't. We didn't get to the point where you were ready to talk about it fully. We respect that. Okay? So, if you want us to come back, you want me write down my phone number and you can give us a shout when you. When you are ready. If you are ready. You want to do that?

55:34 **KENDALL FORRESTER** Sure.

55:34 **INVESTIGATOR WALDEN** Because you still have the opportunity.

55:38 **AGENT COLLINS** Look, dude, [Defendant stands, retrieves his tissues, and throws them away] and we're not the type of guys that are gonna give up on ya, okay?

55:45 **INVESTIGATOR WALDEN** You know, like you said, you know, I mentioned it. We don't know you, but you're not coming across us as, like, just some psycho killer, you know what I mean? There's a lot of circumstances [Defendant sits in chair, remains through rest of video] that can lead up to whatever happened. We're just trying to fill in gaps.

56:08 **AGENT COLLINS** I'll tell them. I'm getting this to you. You can throw it away if you want. You can do whatever you want with it, okay? But I'm just telling you, if you want to come back to us, at some point, you can give me a call. Okay?

56:19 **INVESTIGATOR WALDEN** You can give him a call and he'll get ahold of me, and we'll chat

56:26 **AGENT COLLINS** Appreciate you, man. Okay? I know we're here for a bit, and I know everything you talked about today is not easy to talk about. So, when you are ready to talk about the rest, we're here to do, okay? Like we told you when we first came in here, we're not here to trick you. We're not here to pressure you. We were here just to listen, okay? And what

-8-

you were willing to give us today was, I think, a step not only in understanding the full picture, but also helping you, man, come to some type of closure with this s***ty experience that you had, okay? And I'm hoping, and I'm hoping that you start to heal on your own, dude, because no one should have to go through experiencing and seeing your own blood get killed by someone that you trust and have had a relationship with, okay? So, keep my number, dude. When you're ready, we'll be there. Okay? So, hold tight, and then I'll have them come get you. Okay? Do you have any questions for me?

57:28 **INVESTIGATOR WALDEN** Do you need another paper towel?

57:28 **KENDALL FORRESTER** Yep

57:38 **INVESTIGATOR WALDEN** I know this is tough. Just hang in there. Like I said, you get the situation that you dealt with? I don't know anything about it. I have heard a little bit, but basically all I know is that it happened. You being laying in bed next to where it happened, dude, I can't imagine what you're going through. Like, my heart breaks. I don't even know him. I don't know you. I love kids, so I can't imagine the trauma that you felt and are still feeling right now. Okay? But I can tell. Just like. Like you said, we can tell. It gets to you. You're showing so much emotion right now. That's not somebody that's cold hearted.

58:39 **AGENT COLLINS** Kendall, give us a call. Okay, buddy?

59:23 **INVESTIGATOR WALDEN** I'll be over there shortly.

59:25 **INVESTIGATOR WALDEN** So, let's uh, if you're having a hard time, let's talk about something that's not so sad, because I understand you like the hunt.

59:34 **KENDALL FORRESTER** Yea

59:34 **INVESTIGATOR WALDEN** You mainly like a deer hunter. You like turkey hunting or a little bit of everything?

*Id.*, pp. 3-18.  Agents continued to discuss topics unrelated to the investigation, with minimal responses from Defendant, until the recording was turned off at 1:01:51.  At no time during the hearing did Agent Collins or Investigator Walden leave the room during the interrogation.  The Transcript reflects Defendant uttered "I'm done" six times at five different places (7:02, 16:39, 17:50 (twice), 17:58, 53:50), and additionally asked the officers if they were done twice (40:41, 44:25).

### Analysis

Defendant moves to suppress any statements made by him during his interview with Agent Collins and Investigator Walden, asserting he unequivocally stated his desire to end the interrogation the first time he said, "I'm done," and that the remainder of the interrogation violated his Fifth Amendment rights and should therefore be suppressed. The Government contends that every time Defendant stated "I'm done" was ambiguous or equivocal until he said this phrase at the 53:50 mark in the interview transcript.

The parties agree that Defendant underwent a custodial interrogation, as he was clearly in custody, having been arrested on November 2, 2023, taken into custody to the Leflore County Jail, and questioned there the same day. Additionally, the recordings reflect that Agent Collins read Defendant his *Miranda* rights and Defendant signed a waiver before the questioning began. Defendant does not challenge that the initial waiver of his *Miranda* rights was given knowingly, voluntarily, and intelligently. *Miranda*, 384 U.S. at 444 ("The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently."). The question, then, is whether and when during the interrogation Defendant invoked his Fifth Amendment right to remain silent, and whether the law enforcement officers "scrupulously honored" that invocation. *Id.* at 479. The undersigned Magistrate Judge finds that each of Defendant's statements of "I'm done" was an unequivocal invocation of his Fifth Amendment right to remain silent and that all statements by Defendant should be suppressed after the first invocation, reflected at 7:02 in the Transcript. Defendant's motion should therefore be granted.

-10-

Right to Remain Silent. No person "shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. "Under *Miranda*, law enforcement officers must advise a suspect who is subjected to custodial interrogation that he has the right to remain silent, that statements can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed." *United States v. McCluskey*, 893 F. Supp. 2d 1117, 1138 (D.N.M. 2012). Invocation of the right must be "'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 103-104 (1975) (quoting *Miranda*, 384 U.S. at 479).

"If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease." *Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010). Under certain circumstances, "police may reinitiate questioning, but only if four conditions are met: '(1) at the time the defendant invoked his right to remain silent, the questioning ceased; (2) a substantial interval passed before the second interrogation; (3) the defendant was given a fresh set of *Miranda* warnings; and (4) the subject of the second interrogation [is] unrelated to the first.'" *United States v. Alexander*, 447 F.3d 1290, 1294 (10th Cir. 2006) (quoting *Mosley*, 423 U.S. at 104-105); *see also United States v. Coleman*, 554 F. Supp. 3d 1124, 1145 (D.N.M. 2021) ("All questioning of a suspect subject to custodial interrogation must end once he invokes his right to an attorney, until the attorney is present, 'unless the accused himself initiates further communication, exchanges, or conversations with the police.'") (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-485

(1981)).  "This four-part test is inapplicable, however, if the suspect, and not the police, reinitiates contact and agrees to questioning."  *Alexander*, 447 F.3d at 1294.

"Determining whether a suspect has invoked his right to counsel 'is an objective inquiry.'  The question is whether the suspect's statement is 'sufficiently clear that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'"  *United States v. Nelson*, 450 F.3d 1201, 1212 (10th Cir. 2006) (quoting *Davis v. United States,* 512 U.S. 452, 459 (1994)).  This same principle applies to the right to remain silent.  *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) ("[T]here is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*. . . . There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously.").  "To prevent the privilege from shielding information not properly within its scope, we have long held that a witness who desires the protection of the privilege . . . must claim it at the time he relies on it."  *Salinas v. Texas*, 570 U.S. 178, 183 (2013)) (internal quotations and citations omitted)).  "[A]mbiguous or equivocal statements that *might* be construed as invoking the right to counsel do not require the police to discontinue their questioning."  *Nelson*, 450 F.3d at 1212 (citing *Davis*, 512 U.S. at 458-459 ("[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.")).  "Being evasive and reluctant to talk is different from

-12-

invoking one's right to remain silent." *Mann v. Thalacker*, 246 F.3d 1092, 1100 (8th Cir. 2001).

Defendant uses the phrase "I'm done" six times during the interrogation. Invocation of the right to remain silent does not require a "ritualistic formula or talismanic phrase [] in order to invoke the privilege against self-incrimination[.]" *Emspak v. United States*, 349 U.S. 190, 194 (1955). Defendant's use of the word "done" echoes the phrasing specifically used by Investigator Walden when he explained Defendant's right to terminate the interview at any time. Docket No. 29, Ex. 1, p. 3 ("[I]f we start talking and you decide to stop, *all you gotta do is tell us. And we're done.* And we won't ask you anything else."). "Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease." *Smith v. Illinois*, 469 U.S. 91, 98 (1984). Additionally, "under the clear logical force of settled precedent, an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver." *Id.* at 100. "Courts construe statements such as 'I have nothing more to say' and 'I'm done' both ambiguous and unambiguous invocations of the right to remain silent after *Berghuis*.'" *Becker v. Wetzel*, 2020 WL 4674118, at *21 (E.D. Pa. Aug. 12, 2020) (collecting cases). The conclusions are based, not just on the words used, but the context as well, based on the totality of the circumstances. Each invocation made during Defendant's interrogation is discussed in turn.

First invocation (7:02).  At 7:02, Defendant says, "That's it.  I'm done.  F*** this."
As he says these words, he slashes his right hand down and to the right in a "no" gesture.
The officers sit in silence, unmoving, for fifteen seconds while Defendant moves his chair
forward toward the door then back to the wall, then swings his shackled feet onto the edge
of the desk in the room.  Defendant pauses while leaned back, adjusts his handcuffs, then
points to his right leg and says, "Look at that new tattoo on her leg. That one's[] my
nephew. F*** her."  Only then did Agent Collins ask Defendant:

> *I just want to be clear.* It seems like you have a lot of emotions going on right
> now. And I feel like you, to some extent, want to talk to us. But are you
> telling us at this point, that you don't want to talk to us without the lawyer
> present, because there's obviously more to this. I mean, I don't know what
> you're talking about with the tattoo, but, I mean, I just got to be clear before
> we go into further details on this, where you're at, I just got to know if you're
> saying you don't want to talk to us, without a lawyer present? I know you
> said, f*** this, but.

Docket No. 29, Ex. 1, p. 3, 7:30.  Defendant's statement at 7:02 represents an unequivocal
invocation of his right to remain silent.  The Government contends that his invocation was
ambiguous or unequivocal because Defendant began speaking before the officers did,
Agent Collins asked him if he wanted an attorney present, and Defendant does not reiterate
his invocation upon clarifying questions but instead states "ya'll" have not done anything
for him in the past.

Once an accused invokes his right to remain silent, it must be "scrupulously
honored," *Miranda*, 384 U.S. at 479 "unless the accused himself initiates further
communication, exchanges, or conversations with the police." *Edwards,* 451 U.S. at 485.

"The rigid prophylactic rule requiring all questioning to cease upon a suspect's invocation of his right to counsel 'is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.'" *Coleman*, 554 F. Supp. 3d at 1145-1146 (quoting *Davis*, 512 U.S. at 458) (quoting *Michigan v. Harvey*, 494 U.S. 344, 350 (1990)). As noted above, after the right to remain silent has been invoked, "police may reinitiate questioning, but only if four conditions are met: '(1) at the time the defendant invoked his right to remain silent, the questioning ceased; (2) a substantial interval passed before the second interrogation; (3) the defendant was given a fresh set of *Miranda* warnings; and (4) the subject of the second interrogation [is] unrelated to the first.'" *Alexander*, 447 F.3d at 1294 (quoting *Mosley*, 423 U.S. at 104-105). "The determination as to whether the police have scrupulously honored the defendant's right to remain silent rests in part upon their immediate response to the defendant's invocation of the right; a showing of respect for the defendant's right, by immediately ceasing questioning upon its invocation, is a significant factor in this analysis." *Mack v. State*, 765 S.E.2d 896, 901 (Ga. 2014) (citing *Mosley,* 423 U.S. at 105-106 (right to remain silent was scrupulously honored where, *inter alia*, police "immediately ceased the interrogation" upon defendant's invocation of right)). In other words, "the central focus of the determination here is the conduct of the law enforcement authorities[, rather than Defendant]: the courts must consider all of the circumstances surrounding the conduct of law enforcement authorities in assessing whether, in the particular case, they 'scrupulously honored' the defendant's right to cut off questioning." *United States v. Dell'Aria*, 811 F. Supp. 837, 843 (E.D.N.Y. 1993), *affirmed*,

14 F.3d 591 (2nd Cir. 1993). While the Government seeks to focus on Defendant's action, the undersigned Magistrate Judge looks to the totality of the circumstances, particularly the officers' action.

Upon review of the interaction between Defendant and the officers, and in view of the entire context, the undersigned Magistrate Judge finds Agent Collins and Investigator Walden failed to scrupulously honor Defendant's invocation of his right to remain silent when, instead of immediately ceasing the questioning, they sat unmoving and made no move to end the interrogation after Defendant unequivocally, with words and actions, invoked his constitutional right to remain silent. Black's Law Dictionary defines "immediate" as: "1. Occurring without delay; instant <an immediate acceptance>. 2. Not separated by other persons or things <her immediate neighbor>. 3. Having a direct impact; without an intervening agency <the immediate cause of the accident>." Black's Law Dictionary (12th ed. 2024). Any reasonable officer would have interpreted Defendant's "I'm done" and accompanying hand gesture as an invocation of the right to remain silent. The officers' silence and failure to immediately cease the encounter, during which they chose to wait for Defendant to make the next move rather than immediately cease the interrogation, constitutes a failure to respect the Defendant's rights and demonstrates an "active role in continuing the interview after [Defendant] invoked his rights." *United States v. Rambo*, 365 F.3d 906, 911 (10th Cir. 2004); *see also United States v. Coriz*, 2018 WL 4222383, at *8 (D.N.M. Sept. 5, 2018) (citing *Rambo*, "Rather than analyzing the degree of coercion, the Tenth Circuit focused on whether law enforcement played an active

role in continuing the interview and whether there was 'some break in the interrogation.'")
(quoting *Rambo*, 365 F.3d at 911).

"[U]nder the Supreme Court's 'bright-line' rule in *Edwards*, police must scrupulously adhere to a request for silence, stop the interrogation, and give space to a suspect to reinitiate the conversation on his own. Where police offer no break, the courts have found a Fifth Amendment violation." *Coriz*, 2018 WL 4222383, at *9. Officers did not immediately cease questioning Defendant and offered no break after his unequivocal invocation of his Fifth Amendment right to remain silent. Rather than scrupulously honoring the invocation and immediately ceasing the interrogation following the invocation, the officers waited for Defendant to make the next move. Once Defendant began speaking after the silence, Agent Collins asks if Defendant was requesting an attorney, not whether he was invoking the separate right to remain silent—the right at issue here. Under the totality of the circumstances, the undersigned Magistrate Judge finds that the officers' silence appears to be a tactic designed "to wear down his resistance to make him change his mind," *Mosley*, 423 U.S. at 105-106, in clear violation of the Fifth Amendment. *Id.* at 102 ("To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of Miranda by allowing repeated rounds of questioning to undermine the will of the person being questioned."); *see also Jones v. Harrington*, 829 F.3d 1128, 1132 (9th Cir. 2016) ("When a suspect invokes his right to silence, the officers' interrogation must cease. Period. . . . Allowing the state to use Jones's post-invocation statements against him, even to argue that his initial invocation

was ambiguous, is thus contrary to clearly established Supreme Court case law."); *cf. State v. Gonzalez*, 25 A.3d 648, 658 (Conn. 2011) ("Contrary to the state's claim, the passage of approximately sixty seconds does not dictate that the defendant's interrogation must be segregated into periods of improper interrogation and no interrogation. Second, although the defendant stated that he wanted an attorney, in response to his invocation he observed the officers seemingly make no effort to honor this request or explain to him that an attorney would be obtained for him; instead, they told him to sit and wait to be booked and they then remained seated at the table*, staring in silence at the defendant until he began making the contested statements*. Third, although the defendant had stated that he would not speak with the officers, his request to remain silent was not scrupulously honored because no steps were undertaken to conclude the interrogation or belatedly advise the defendant of his *Miranda* rights.") (emphasis added); *see also Smith*, 469 U.S. at 98 ("After the right to remain silent has been invoked, an "accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked.").  This is distinguishable from cases in which a Defendant *immediately* or *without pause* begins speaking.  *See, e.g.*, *United States v. Williams*, 690 F. Supp. 2d 829, 836-837 (D. Minn. 2010) ("'I'm done answering questions, I'm sorry, goodbye.' Officer Freichels responds, 'You're done?' Capers responds, 'Yes,' but, **without pause,** quickly launches into a monologue explaining her situation and claiming 'I didn't do anything.' Her desire to remain silent was not clear, consistent, or unequivocal.") (citation omitted) (emphasis added); *Tolliver v. Sheets,* 594 F.3d 900, 919 (6th Cir. 2010) ("[E]ven if he did invoke his

right to remain silent with these two statements, he **immediately** (and without police prompting) volunteered additional information. He cannot have it both ways: if he wanted to invoke his *right* to remain silent, he then needed to *remain* silent.") (emphasis in original) (bold emphasis added). "At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Miranda*, 384 U.S. at 474. Accordingly, the undersigned Magistrate Judge finds suppression should be granted.

Second invocation (16:39). Defendant unequivocally invokes his Fifth Amendment right to remain silent for the second time at the 16:39 mark of the transcript, and the officers again fail to scrupulously honor the invocation. For nearly forty seconds leading up to his second statement, "but anyway, I'm done," Defendant appears to be asking the officers if they had something to tell him, because he thought they had said that earlier, and Agent Collins responded that they "would rather just listen to you." In response, Defendant said, "I bet you would." (16:22, 16:28). From that point, the exchange continues:

> 16:28 **AGENT COLLINS** because stuff you're mentioning right now about possible foul play.
> 16:34 **KENDALL FORRESTER** That's a lot of s*** you don't know.
> 16:34 **AGENT COLLINS** Exactly. That's why, huh?
> [Defendant stands]
> 16:39 **KENDALL FORRESTER** but anyway, *I'm done*
> [Defendant sits down with hands clasped and head bowed]
> 16:39 **AGENT COLLINS** You're not.[6] You don't want to tell us your side of things. [Defendant shakes head from left to right in apparent "no" gesture, eight seconds of silence] We're just trying to hear your side, man.

---

[6] *See, supra*, n.5. "You're not-- you don't want to tell us your side of things. . . ." Upon review of the video, this does not appear to be a statement of direct contradiction by Agent Collins, but a slight stumbling over words as Agent Collins attempts to salvage the interrogation.

Docket No. 29, Ex. 1, p. 7.  The context of Defendant's statement, along with his physical movement, makes clear he invoked his Fifth Amendment right to remain silent a second time.  At the suppression hearing, Agent Collins attempted to distinguish this exchange from the later exchange at 53:50 by the fact that, at 16:39, Defendant sat back down in the chair after he stood up here, whereas at 53:50 Defendant stood up and did not return to the chair, instead perching on the edge of the desk.  This fails to account for the fact Defendant was in handcuffs and leg shackles, as well as an orange jumpsuit, and had no freedom of movement, inside or outside the interrogation room, as he was under arrest and in custody at the jail.  More importantly, nothing in the case law requires an attempt to leave a room before officers are required to terminate an interrogation.  The law accounts for the full context of a Defendant's invocation, including physical action.  One specific physical movement, *i.e.*, standing up and not returning to a seat, is not required. From the entire context here, the undersigned Magistrate Judge concludes Defendant unambiguously invoked his right to remain silent.

The undersigned Magistrate Judge finds a reasonable officer would have understood Defendant's statement at 16:39 to be a clear invocation of his right to remain silent. *See, e.g.*, *Mack v. State*, 765 S.E.2d 896, 900 (Ga. 2014) ("Mack unambiguously and unequivocally invoked his right to remain silent when he stated during the November 1 interview, 'I'm done. I have no more to say. I'm done. Let's ride.'  These statements, followed closely by similar expressions of Mack's desire to stop talking amidst the investigators' entreaties to him to tell the truth, clearly articulated Mack's desire that

further questioning cease.").  In point of fact, the Government agrees that these same words and very similar actions constitutes an invocation of the Fifth Amendment right to remain silent at 53:50.  Notably, none of Defendant's statements included any qualifiers such as "maybe," "might," "now," or "to you."  *See Flores v. Muniz*, 2018 WL 1806184, at *10 (E.D. Cal. Apr. 17, 2018) ("Additionally, Petitioner did not state, 'I'm done talking <u>now</u>' or 'I'm done talking <u>to you</u>,' statements which might have cast doubt on whether Plaintiff truly wished to remain entirely silent.").  *Compare with United States v. Adams,* 2016 WL 385965, at *4 (D. Minn. Jan. 7, 2016) ("In *Demikh,* during the course of interrogation, the defendant stated, 'I mean I'm done talking unless you really got evidence that I did it,' and, 'S***, I don't have nothing to say I guess.' Both of these statements had qualifiers and were not unequivocal invocations of the right to remain silent.") (quoting *United States v. Demikh*, 2015 WL 6445302, at *6 (D. Minn. Oct. 21, 2015)).  Furthermore, Defendant's physical movements, including standing, shaking his head "no," and eight seconds of silence provide further context of Defendant's clear invocation.  *See, e.g.*, *Deviney v. State*, 112 So. 3d 57, 77-78 (Fla. 2013) ("However, Deviney dispelled any such argument by a subsequent reiteration of his wish to end the interrogation, '*I'm done.* I'm ready to go home. Can I leave?' After this statement, Deviney further indicated his desire to end questioning by standing and attempting to leave the interrogation room. This conduct demonstrated an obvious desire by Deviney to leave the interrogation room for the purpose of *ending questioning*.") (emphasis added).  After Defendant invoked his right to remain silent, Agent Collins and Investigator Walden were required to cease questioning but failed to do so.

-21-

There was no interval, much less a substantial interval, between his invocation and the officers' continued questioning, nor was there a reissued *Miranda* warning, and the discussion both before and after were related to the same incident. Accordingly, none of the four *Mosley* factors are met to support reinitiating interrogation. *Alexander*, 447 F.3d at 1294 ("[P]olice may reinitiate questioning, but only if four conditions are met: '(1) at the time the defendant invoked his right to remain silent, the questioning ceased; (2) a substantial interval passed before the second interrogation; (3) the defendant was given a fresh set of *Miranda* warnings; and (4) the subject of the second interrogation [is] unrelated to the first.'") (quoting *Mosley*, 423 U.S. at 104-105). *See, e.g.*, *Coriz*, 2018 WL 4222383, at *8 ("Sullivan did not cease her questioning after any of the three invocations of Coriz's right to silence. There was no substantial interval between each of Defendant's invocation and Sullivan's continued questioning and commentary. Sullivan did not give Coriz a fresh set of *Miranda* warnings, and the subjects of the interrogation before and after the invocations were related. Consequently, the four-factor test in *Mosley* has not been met to permit Sullivan to reinitiate questioning."). Important here is the reminder that these four factors are "not simply one of the voluntariness of the statement a defendant ultimately makes. Rather, the central focus of the determination is the conduct of the law enforcement authorities: the courts must consider all of the circumstances surrounding the conduct of law enforcement authorities in assessing whether, in the particular case, they 'scrupulously honored' the defendant's right to cut off questioning." *Dell'Aria*, 811 F. Supp. at 843. A close look at the officers' conduct demonstrates that they did not scrupulously honor this

invocation.  Instead, their focus remains on continuing the interrogation, and they continue asking Defendant about the circumstances in the case and the victim, as well as encouraging him to not "hold that stuff in."  (16:39-17:43).  While doing so, the officers also made no move to initiate a break, much less terminate the interrogation.  *United States v. Kouayara*, 189 F. Supp. 3d 835, 846 (D. Minn. 2016) ("Here, nothing indicates that [Special Agent] Zahn sought to 'cease' his interview with [Defendant] Kouayara. Zahn did not stand up, walk out, or direct Kouayara to a phone where she could call an attorney. And Zahn did not attempt to turn off the recording device. Zahn instead made an additional statement—'Then I'm not going to talk to you about anything that went on the other night or ask you any questions'—and asked an additional question—'Do you have a lawyer right now?' Thus, Zahn did not cease his interview with Kouayara after she invoked her right to counsel, as the Supreme Court's rules in *Miranda* and *Edwards* require for the government to be able to admit into evidence a defendant's post-invocation statements.").

Because the officers did not "scrupulously honor" Defendant's invocation, the undersigned Magistrate finds Agent Collins and Investigator Walden again violated Defendant's Fifth Amendment right to remain silent after his invocation at 16:39.  *See, Coriz*, 2018 WL 4222383, at *9 ("Any pressure appears to be too much after the right to silence or request for counsel has been invoked."); *see also United States v. Gilman*, 2023 WL 8716850, at *3 (D.N.M. Dec. 18, 2023) ("After [Defendant] Gilman invoked his right to remain silent, [Lieutenant] Hernandez was required to cease questioning. He failed to do so. Instead, he continued the interview by discussing potential leniency (vague offers to

"help" Gilman), the evidence (the DNA, the witnesses, and the video), and possible federal charges (stemming from Gilman's status as a felon). Because Hernandez did not "scrupulously honor" Gilman's invocation, any subsequent statements (made between invocation and reinitiation of the interrogation) will be suppressed. . . . Hernandez played an active role in continuing that conversation—a crucial detail that is fatal to the Government's claim that Gilman voluntarily, knowingly, and intelligently waived his *Miranda* rights when he initiated conversation with Hernandez.") (internal citation omitted); *Rambo*, 365 F.3d at 911 ("When Rambo stated that he did not want to discuss the robberies, Moran made no move to end the encounter. Instead he acknowledged Rambo's request, but told Rambo that he would be charged with two aggravated robberies and that other agencies would want to speak with Rambo. Those comments reflect both further pressure on Rambo to discuss the crimes and a suggestion that despite Rambo's present request to terminate discussion of the topic, he would be questioned further."); *Adams*, 2016 WL 385965, at *4 ("[Defendant], however, did not continue talking after he invoked his right to silence, [Officer] did."); *Jones*, 829 F.3d at 1140-1141 ("When Jones said 'I don't want to talk no more,' the officer responded: 'I understand that but—.' That means the government cannot rely on Jones's later statements to establish that his earlier statement was ambiguous.").

Subsequent invocations.  The next three times Defendant states, "I'm done" come in quick succession, beginning at 17:50:

17:50 **KENDALL FORRESTER** Anyway, ***I'm done. I said I'm done.***

> 17:53 **AGENT COLLINS** *Okay. We respect that.* But you got[ta] understand.
> 17:58 **KENDALL FORRESTER** *No, I said I'm done.*
> 17:58 **AGENT COLLINS** *I can talk, though.* We're at a point where we don't even get an opportunity to hear this explanation.

Docket No. 29, Ex. 1, p. 8. It is clear Agent Collins understood Defendant to be making an unequivocal invocation because he spoke to Defendant for a full minute, concluding, "But at this point, dude, we just. *We can't speak with you because you've told us multiple times. That's where your stance on. Okay, get that.*" Investigator Walden followed that statement with, "Now, understand, if something changes and you do want to get. I mean, if it was, if whatever happened, was self-defense." *See, e.g.*, *State v. Rogers*, 760 N.W.2d 35, 61-62 (Neb. 2009) ("Not only should a reasonable officer in Wheeler's position have understood those statements to be an invocation of the right to remain silent, it appears that Wheeler actually understood the statements in this way, because Wheeler responded: 'Well, just listen then.' Wheeler's instruction to 'just listen' implicitly acknowledged that Rogers intended to stop talking. But Wheeler's training, by her own admission, had apparently not informed her that a suspect's statements, such as 'I'm done' and 'I'm not talking no more,' should be scrupulously honored. So, Wheeler pressed on, and was eventually able to extract a confession."). This far exceeded the scope of allowable communication with a Defendant following an invocation of the right to remain silent and again demonstrates the officers' failure to terminate the interview upon invocation. *See, e.g.*, *Munson v. State*, 123 P.3d 1042, 1048-1049 (Alaska 2005) ("In the face of an unequivocal invocation of those rights, police interrogators have very limited discretion to

inquire into the defendant's subjective intent because they cannot, even to clarify a suspect's intent, 'wear down his resistance and make him change his mind.'").  Applying the *Mosley* factors, questioning failed to cease, no time passed, Defendant was not re-*Mirandized*, and the officers continued in the same vein of discussion.  *Mosley*, 423 U.S. at 104-105.  Officers met none of the factors for re-initiating contact, thus failing to scrupulously honor all three invocations in violation of Defendant's Fifth Amendment right to remain silent.

After Defendant's fifth "I'm done," the interrogation continues for approximately twenty more minutes before Defendant switches to asking the officers if they are done. This appears, from the context, to be a change of expression since informing the officers that he was done had not worked.  It is also noteworthy because this, too, echoes the language used by Investigator Walden at the outset:  "*all you gotta do is tell us. And we're done*."  Both times Defendant asks, he is answered in the negative:

> [39 second of silence]
> 40:41 **KENDALL FORRESTER** *Y'all done[?]*
> 40:41 **AGENT COLLINS** *I'm not, dude.*
>
> [66 seconds of silence]
> 44:25 **KENDALL FORRESTER** *Yep. All right then, y'all done?*
> 44:31 **INVESTIGATOR WALDEN** *We're just trying to give you ample opportunity to tell us anything that you want to tell us. Do we want to be done? No.*

While not, on their own, additional unequivocal invocations of the Defendant's right to remain silent because they appear to be questions and therefore do not represent a clear and unambiguous desire to remain silent, the undersigned Magistrate Judge finds these

-26-

exchanges further provide context for Defendant's previous and repeated efforts to end the interrogation. By this point in the interrogation, Defendant has thus unambiguously attempted to end the interrogation five times, with two additional ambiguous attempts.

Final invocation (53:50). The final time Defendant states, "But anyway, there it is. I'm done. I really am. Now" and stood up, the officers stated that they would "respect that," but continued to ask him questions, including:

> "So, all we have right now is Angie, dead, you know, in a wooden box. And there's a reason for that, okay? You're definitely not a type of guy that just does it because he wants to do it. There's a reason why all this happened, okay? And I believe that 100%. And until we hear that from you, all we have is Angie in a box, okay?"

Docket No. 29, Ex. 1, p. 17; Docket No. 34, Ex. 1 (audio). The Government asserts that the invocation at 53:50 was different from previous statements and that questioning ceased at that time. The undersigned Magistrate Judge is wholly unpersuaded by this contention. Agent Collins testified that, for him, the difference between the five previous "I'm done" statements was that at the 53:50 mark Defendant said the same words but also stood up and never returned to his seat. He distinguished this from the exchange at 16:39 where Defendant stood up, said "I'm done," then sat back in his chair. Agent Collins's testimony was that it was Defendant's refusal to return to his chair that led him to interpret Defendant's final "I'm done" as an unequivocal invocation. The Government points to no law, and the undersigned Magistrate Judge has been unable to find any, that *requires* a Defendant to accompany the invocation of his Fifth Amendment right to remain silent with specific physical movement, such as standing and not returning to a seat despite being

shackled. In truth, the undersigned Magistrate Judge finds Defendant's "hand slashing gesture" at 7:02 which accompanied the same words, "I'm done[,]" to be even more clearly definitive a physical movement than standing, either accompanied by returning to a seat or refusing to do so. While it is difficult to interpret the hand gesture, alone, as anything other than a definitive movement to cut off conversation, standing and failing to sit again could be interpreted in a number of ways: a suspect is restless, has back pain, thinks better on their feet, *or* is trying to end the encounter, as is the appropriate interpretation in the context of the particular facts in this case at both 16:39 and 53:50. More importantly, the recording itself disproves the Government's argument that the officers scrupulously honored Defendant's invocation of his right to remain silent at the 53:50 mark in the Transcript. After the invocation at 53:50, Agent Collins and Investigator Walden continued talking at Defendant for five minutes and eighteen seconds, including references to how the deceased victim was found, statements that Defendant still had an opportunity to talk, assertions that they were just trying to fill in the gaps, and offers to help bring him closure. During this time, Defendant only responded twice, once with "Sure" to agree that Agent Collins could give him a phone number to call and again with "Yep" when asked if he needed another paper towel. It was not until well over five full minutes later that the officers changed the subject to hunting and continued on this subject for two more minutes before the recording ends. This contradicts any assertion that the interrogation ended after invocation of Defendant's right to remain silent at 53:50, the sixth unambiguous invocation. Even here, Agent Collins and Investigator Walden failed to "scrupulously honor" Defendant's Fifth

-28-

Amendment right to remain silent. *See, e.g.*, *Rogers*, 760 N.W.2d at 57 ("[W]hen Rogers finally declared that she was 'done' and was not going to talk any more, the officers still failed to indicate in any way that she was free to leave.").  Furthermore, this belies the Government's argument that there was something different, or more definitive, about the context of Defendant's sixth invocation that set it apart from his earlier ones.

Impeachment.    While the undersigned Magistrate Judge finds Defendant's statements after his invocation at 7:02 should be suppressed as the product of a *Miranda* violation, an examination of the voluntariness of Defendant's statements is nevertheless necessary to determine whether his statements could be used for impeachment purposes. "Statements made by a defendant in circumstances violating the strictures of *Miranda v. Arizona, supra*, are admissible for impeachment if their trustworthiness . . . satisfies legal standards. But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law, even though there is ample evidence aside from the confession to support the conviction."  *Mincey v. Arizona*, 437 U.S. 385, 397-398 (1978) (internal quotations and citations omitted).

To determine whether a confession was involuntary as a matter of fact, courts must assess the totality of the circumstances, including the characteristics of the accused and details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The Tenth Circuit has held that the following factors are relevant to the voluntariness determination: "(1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was

-29-

advised of her constitutional rights; (5) whether the defendant was subject to physical punishment." *United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997), *abrogated on other grounds in Corley v. United States*, 556 U.S. 303 (2009).

Neither party briefed this issue. Upon questioning at the suppression hearing, the Government simply took the position that the statements were admissible for impeachment purposes but provided no further argument or explanation. Defendant disagreed. The undersigned Magistrate Judge finds Defendant's statements were not overly coercive such that they should be suppressed for purposes of impeachment. There are no allegations or evidence regarding Defendant's age or education level, the interview was not particularly lengthy, there was no evidence of physical punishment, and Defendant was read his *Miranda* rights and signed a waiver. It is concerning, however, that the officers continued encouraging Defendant to speak and kept asking him for his side of the story even after Defendant had invoked his right to remain silent six times. The officers' tactics included stating that they wanted to get an explanation and details, and that "bottling stuff in" could be dangerous. In other words, after officers failed to scrupulously honor Defendant's invocation, they continued to exert pressure on him. *See Coriz*, 2018 WL 4222383, at *10 ("[T]he fact that Sullivan did not scrupulously honor Coriz's repeated invocations of this *Miranda* right to silence weighs strongly in favor of a finding of coercion."). Although the clear violations of Defendant's Fifth Amendment right weigh in favor of suppression even for impeachment purposes, the undersigned Magistrate Judge cannot say that they exerted the type of psychological pressure sufficient to render Defendant's statements involuntary

despite the officers' persistent refusal to end the interrogation when Defendant requested. *United States v. Walker*, 2001 WL 421257, at *3 (D. Kan. Apr. 19, 2001) ("While the officers violated defendant's right to remain silent, nothing occurred during the interrogation that would call the trustworthiness of the statements in question."). *Compare with United States v. Briscoe*, 2023 WL 8019444, at *5 (D.N.M. Nov. 15, 2023) (suppressed for impeachment purposes where factors for involuntariness included "inferring that they just wanted to hear his side of the story and by failing to dispel his belief that they were there to help him," but were largely supported by the officers' actions that "made it seem like Mr. Briscoe could not have an attorney present if he chose to speak to [the officer]."), and *Coriz*, 2018 WL 4222383, at *10 ("It is the combination of evidence of psychological pressure that crosses the threshold to coercion: misrepresenting that Coriz failed the polygraph and that it was not even close; repeatedly suggesting that he could get help and therapy, rather than prison if he confessed; suggesting agents would tell his community he failed the polygraph test if he did not confess; and most significantly, not ending the interview when Coriz said he did not want to say anything more.").

In summary, the undersigned Magistrate Judge finds that all statements made by Defendant after he invoked his Fifth Amendment right to remain silent beginning at 7:02 of the generated Transcript should be suppressed, except for purposes of impeachment.

## Conclusion

Accordingly, the undersigned hereby PROPOSES the findings set forth above and RECOMMENDS that the Defendant's Opposed Motion to Suppress Statements and Brief

in Support Therein [Docket No. 29] be GRANTED.  Defendant's statements beginning at 7:02 of the generated Transcript should be suppressed, except for purposes of impeachment.  Any objections to this Report and Recommendation must be filed within fourteen (14) days.  Any objections and response shall each be limited to 10 pages and a reply is permitted only with leave of court upon a showing of good cause.

IT IS SO ORDERED this 17th day of July, 2024.

_____
**GERALD L. JACKSON**
**UNITED STATES MAGISTRATE JUDGE**